**Lisa MANN, Plaintiff,**

v.

**UNIVERSITY OF CINCINNATI, et al., Defendants.**

No. C–1–92–852.

United States District Court, S.D. Ohio, W.D.

Nov. 9, 1993.

Robert Hugh Gutzwiller, Cincinnati, OH, for plaintiff.

Frank Hale Stewart, Rosemary Doreen Canton, Taft, Stettinius & Hollister, Cincinnati, OH, for defendants.

## ORDER AFFIRMING MAGISTRATE JUDGE'S ORDER

SPIEGEL, District Judge.

This matter is before the Court on the Magistrate Judge's Report and Recommendation (doc. 12), the Defendants' Objections (doc. 13), the Plaintiff's Response to Defendants' Objections (doc. 17), the Defendants' Reply (doc. 19), the Plaintiff's Application for Partial Award of Attorney's Fees (doc. 22), and the Defendants' Response (doc. 23).

## BACKGROUND

In his Order the Magistrate Judge recounted in detail the facts of this case. We have reviewed the Magistrate Judge's Order, 824 F.Supp. 1190 (1993), and find that his findings of fact are not clearly erroneous. *See* 28 U.S.C. § 636(b)(1)(A). Accordingly we conclude that it would be unnecessary for the Court to attempt to improve upon the Magistrate Judge's presentation of the facts. Because the details of the Defendants' conduct in this case are so crucial to the Court's holding, and because we concur in the magistrate Judge's reasoning with respect to Rule 45 and to Ms. Mann's privacy rights,[1] we adopt the following portions of the Magistrate Judge's opinion:

[The documents before the Court] call into question the conduct of defense counsel who, knowing that Ms. Mann objected to their review of her medical records due to the private information contained therein and that her attorney was studying the question whether to release relevant medical records, nevertheless issued a subpoena duces tecum for all of Ms. Mann's medical records, regardless of their relevancy. This subpoena was issued on only one week's notice to Ms. Mann's attorney and was accompanied by an ex parte letter instructing the custodian to release the records prior to the date set forth in the subpoena.

Two business days after the subpoena was issued, defense counsel obtained Ms. Mann's entire medical file without her knowledge and copied several pages. The file included extremely private information she provided years before the events in this case, which is irrelevant to the issues herein. Defense counsel also obtained copies of certain records. In response to the instant motions, defense counsel showed no remorse. surprisingly, they claimed Ms. Mann['s] ... privacy rights were not invaded, and that it was their

---

1. We note our disagreement with the Magistrate Judge's interpretation of the law in this Circuit with respect to the Doctor–Patient privilege. *See* Hancock v. Dodson, 958 F.2d 1367, 1373 (6th Cir.1992); *G.M.C. v. Director of Nat. Institute, etc.,* 636 F.2d 163, 165–66 (6th Cir.1980), *cert.* denied, 454 U.S. 877, 102 S.Ct. 357, 70 L.Ed.2d 187 (1981). However, because we agree with the Magistrate Judge's reasoning with respect to his right to privacy and Rule 45 analysis, we need not consider, beyond this footnote, the privilege issue.

common practice to obtain medical records prior to the subpoena date without notice to opposing counsel or the patient.

\*　　\*　　\*　　\*　　\*　　\*

On October 29, 1992, Ms. Mann filed the instant action, alleging that University of Cincinnati academic employees, defendants Robert Monast and Jon Clemens, sexually harassed her and improperly took unfavorable academic actions against her in violation of her Fourteenth Amendment rights to equal protection of the law and to be free from arbitrary, capricious, and unreasonable academic decisions and that defendant University of Cincinnati failed to take appropriate action to correct these improprieties, all in violation of 42 U.S.C. § 1983. She also alleged that she was denied her right to an education at the University of Cincinnati in violation of 20 U.S.C. § 1681. The aforesaid conduct allegedly took place between September 1990 and July 1991. Among other damages, Ms. Mann alleges she suffered emotional distress, including destruction of her self-esteem and emotional trauma.

During the course of the alleged sexual harassment, on May 28, 1991, Ms. Mann wrote "to whom it may concern," and forwarded her letter to the President of the University of Cincinnati. (Df. Ex. B). The letter stated that she was withdrawing from the University because "I have suffered a major emotional crisis.... The Student Health Clinic should be able to provide you with a diagnosis by Dr. A____ (sic), he's a foreign doctor and I cannot read his writing. He claimed I suffered from 'anxiety' and gave me medicine. I ... decided not to take these drugs and deal with the problem that was *seriously* disturbing me. Also I went to a dermatologist at this time because for the first time in my life I suffered from a complexion problem." Id. (Emphasis in original). This letter was referred to a University of Cincinnati Assistant General Counsel (University counsel), who investigated the matter and consulted with outside counsel, a member of a private Cincinnati law firm (defendants' attorney).

University counsel testified at the hearing that she has managed this case since the complaint was filed in October 1992 and has coordinated the defense with defendants' attorney. In response to defendants' interrogatories, Ms. Mann stated that she told Mr. Clemens in early 1991 that she "had been diagnosed as under stress and had medication." (Doc. 8, Ex. A, plaintiff's answer to interrogatory 9(dd)). She stated that "I continue to suffer mental pain because of the indignities suffered at the hands of Defendants, and remain distressed and outraged at Mr. Monast and Mr. Clemens." (Id., plaintiffs answer to interrogatory 9(ff)). She claimed damages for "emotional pain, suffering, and outrage, shock and degradation of and to person, loss of respect and confidence in education and educational process, and despair at being exposed to such process ... "[l]oss of enjoyment of life due to psychological trauma ... and for anxiety." (Id., plaintiff's answer to interrogatory 17).

On March 2, 1993, during Ms. Mann's deposition, defendants' attorney presented her with releases for her medical records in order to study them in preparation for further deposition questions regarding Ms. Mann's emotional distress claim. Ms. Mann refused to sign the releases believing her medical records contained private information; however, her attorney stated he would study the matter further.

On March 12, 1993, defendants' attorney wrote plaintiff's attorney:

> Upon the postponement of Ms. Mann's deposition on March 2 because of her inability to continue, we requested that she sign medical releases to enable us to obtain her medical records from Doctors Hani Abdulla and Elmore A. Kindel, Jr. We still have not received the signed releases. If we have not received the releases by March 19, we will subpoena the records. We would much prefer, however, to have Ms. Mann's cooperation in this matter.

(Df. Ex. C). Defendants' attorney stated at the hearing that she was aware that Ms. Mann had previously obtained medical

treatment related to a fire and to an automobile accident. Defendants' attorney was searching for this information and any other information about "previous life stressors" as well as any contemporaneous reports by Ms. Mann of sexual harassment.

On March 17, 1993, plaintiff's attorney wrote defendants' attorney: "In reference to your letter of March 12, 1993, requesting medical releases ... I am currently considering these requests." (Df. Ex. D). On April 1, 1993, plaintiffs attorney advised defendants' attorney orally that he was still studying the matter of medical releases and would advise her of his position on April 9, 1993. Defendants' attorney responded that she would subpoena the medical records. Defendants' attorney and University counsel then agreed to issue a subpoena for the medical records.

On Friday, April 2, 1993, defendants' attorney caused to be prepared an AO Form 88 Civil Subpoena to the Custodian of Records for the University of Cincinnati Student Health Services for the "complete medical file of Lisa Mann" to be produced in one week, on April 9, 1993. (Pl. Ex. 1). Defendants' attorney signed the Student Health Services subpoena as the issuing officer. She also subpoenaed Dr. Kindel's medical records for Ms. Mann and may have subpoenaed other records. Defendants' attorney did not limit the subpoenas to the time period or evidence relevant to this case, even though she was aware that Ms. Mann felt the records contained confidential information and had refused to sign a medical release.

On April 2, 1993, a copy of the subpoena was hand delivered to the Student Health Services along with a letter from a paralegal working for defendants' attorney. The letter advised the Student Health Services that defendants' law firm was the University's legal representative. It continued in pertinent part:

As an alternative to your appearance at our firm on April 9th with the documents listed in the subpoena, we would be willing to have you locate and produce copies of those documents for us. We agree to reimburse you for reasonable copy charges but request that they be provided to us *prior* to the subpoena date. If you choose this alternative, please contact me at 381–2838 with the dollar amount that you would be charging us for those copies. We will arrange for pick-up of those documents.

(Pl. Ex. 2) (emphasis in original). Defendants' attorney was aware that this letter had been delivered to the Student Health Services.

The subpoena, in form language drafted by the Administrative Office of U.S. Courts on the reverse side, advises the recipient that "[a] person commanded to produce and permit inspection and copying of designated ... documents ... need not appear in person at the place of inspection unless commanded to appear for deposition, hearing or trial." (Id.). Thus, the recipient was made aware that she could produce the records on the date in question rather than appearing in person at the place set forth in the subpoena. The form language, however, does not authorize the recipient to submit the subpoenaed documents prior to the production date.

On the same date, April 2, 1993, a copy of the subpoena was hand delivered to plaintiff's attorney's office; however, he was not given a copy of the letter instructing the subpoena recipient to release the records prior to the production date. Plaintiff's attorney did not see the subpoena until Monday, April 5, 1993.

Catherine Castillo, Business Manager of the Student Health Services, received the subpoena and the letter on Monday, April 5, 1993. She contacted the University of Cincinnati Legal Department and spoke to University counsel to determine how to respond to the subpoena. Following a discussion with defendants' attorney, University counsel advised Ms. Castillo to produce the records as requested prior to the date set forth in the subpoena. She did not instruct Ms. Castillo to inform Ms. Mann or her attorney that the records were being released before the subpoena date, nor did she inform them herself. University counsel testified that she saw no conflict in her dual roles of having the

subpoena issued and then counseling the recipient to respond to it before the production date.

On Tuesday, April 6, 1993, without any notice to Ms. Mann or her attorney, defendants' attorney travelled to the University of Cincinnati Student Health Services and reviewed Ms. Mann's complete medical file. She copied four pages of the file and took them with her. She also obtained Dr. Kindel's medical records that same day, apparently by instructing him to produce them before the subpoena date. That afternoon, sometime after defendants' attorney had reviewed the medical records and obtained copies, plaintiffs attorney telephoned Ms. Castillo and told her Ms. Mann objected to the release of her medical records and he would be filing a motion with this Court to have the subpoena quashed.

Plaintiff's attorney's action to prevent disclosure of the medical records came only two business days after his office received a copy of the subpoena and one day after he had personally seen it. Ms. Castillo testified at the hearing that she did not advise plaintiffs attorney that defendants' attorney had already seen the records, because she "assumed he already knew." Ms. Castillo reported this incident to University counsel and told her that plaintiffs attorney had not been informed that the records had already been reviewed and copied.

Plaintiffs attorney, having no-knowledge that the medical records had already been reviewed, filed a motion for protective order and to quash the subpoena on Wednesday, April 7, 1993, only three business days after the subpoena had been issued. He requested the Magistrate Judge to conduct a conference to attempt to resolve the privacy issue prior to the production date of April 9, 1993. Defendants' attorney was contacted and agreed to participate in a telephone conference with the Magistrate Judge on April 8, 1993, regarding the question of whether Ms. Mann's medical records should be produced on April 9, 1993.

On the morning of Thursday, April 8, 1993, defendants' attorney filed a memorandum opposing the motion to quash, wherein she stated that she had examined the Student Health Services' medical records and had obtained Dr. Kindel's medical records. She did not state that she had copied and retained Student Health Services records. Although defendants' attorney properly filed this pleading with the Clerk, the Clerk did not deliver it to the Magistrate Judge prior to the telephone conference.

During the telephone conference, plaintiffs attorney described the background of the dispute. He stated that he had no objection to discovery of medical records reflecting Ms. Mann's dermatological treatment; mental treatment, if any; or physical injury treatment likely to produce emotional distress. He agreed that medical records regarding Ms. Mann's treatment for injuries suffered in an automobile accident and a fire were discoverable. However, he objected to records relating to Ms. Mann's gynecological treatment, which he felt were very private and irrelevant. He related that the records contained information so private that Ms. Mann had not authorized him to review them. During the conversation, defendants' attorney did not advise the Court that she had already inspected the records in question. Ms. Mann and her attorney were still unaware her medical records had been examined.

Because it is possible that certain gynecological treatment during the relevant period of time could have resulted in emotional distress, the Magistrate Judge determined that the medical records should be reviewed *in camera* to weigh Ms. Mann's privilege and privacy right to nondisclosure against the possible relevancy the records had to this case. The Magistrate Judge ordered the subpoena quashed and required Ms. Mann to review her University of Cincinnati medical records. Ms. Mann was ordered to produce all such records to which she had no objection on Wednesday, April 14, 1993. Any records to which she objected were to be submitted

to the Court *in camera*, sealed, no later than April 19, 1993. (Doc. 7).

Ms. Mann then travelled to the University of Cincinnati Hospital, where certain of her medical records were on file, and authorized the Hospital to produce a copy of them under seal to the Court. She also travelled to the Student Health Services and obtained a copy of her records to review pursuant to the Court's instructions. There she learned for the first time that the Student Health Services had already permitted defendants' attorney to review her records. On April 12, 1993, Ms. Mann, who was very upset at this news, delivered to the Court a copy of her Student Health Services file and advised the Magistrate Judge's secretary that defense counsel had already examined it without her permission. The Magistrate Judge contacted both counsel that same day and verified that defendants' attorney had indeed reviewed the Student Health Services file. The Court was still not advised that certain records had been copied. Plaintiff's attorney stated he would pursue a sanctions motion, which he filed on April 21, 1993.

In a pre-hearing brief, defendants' attorney claimed, incorrectly, that Fed.R.Civ.P. 45 did not require her to serve a copy of the subpoena on plaintiff's counsel. (Doc. 10, p. 3). She also claimed she was entitled to examine all of Ms. Mann's medical and psychological records, "dating even back to her childhood if necessary, to discover whether other traumatic events in her life could have caused all or part of the psychological distress she claims she suffered." (Id., p. 4). No citation of authority, as required by this Court's rules, supported this claim. She also claimed the Ohio physician-patient privilege applied to Ms. Mann's medical records and that Ms. Mann had waived it by filing this case. (Id. at 4–5).

A hearing was conducted on the pending motions on May 20, 1993. At the hearing, while defendants' now admitted Rule 45 required them to serve a copy of the subpoena on plaintiff's attorney, they also took the position that there was no reason to issue a subpoena. They claimed the Ohio

law of physician-patient privilege did not apply because this was a federal case; that there was no physician-patient privilege recognized in the federal court; and that, because the records belonged to their client, the University, they were entitled to review them. They also asserted, without citing authority, that Rule 45 permitted inspection of records prior to the production date set forth in the subpoena. They stated, surprisingly, that permitting inspection of medical records prior to the subpoena production date was the University's normal practice.

\* \* \* \* \* \*

The Court has now completed its *in camera* review of the medical records from University Hospital and the Student Health Services. These records contain the most private medical and social information a woman possesses. The Student health Services file, which defendants' attorney has already reviewed, includes Ms. Mann's answers to the flowing inquiries:

History of possible disease;

Family History of Disease;

Menstrual History, including onset of first menstrual period;

How often you menstruate, number of days, pain, etc.;

Have you ever had a discharge from your nipples?;

Age at time of first intercourse;

Date of last intercourse;

Number of sexual partners ever;

Number in past 12 mos.;

Number in past 1 month;

What method of birth control are you using now?;

List all types of contraceptives in the past;

Total number of years on the pill;

Any side effects;

Any previous pelvic surgery;

Have you ever had a pelvic infection;

Have you ever had a vaginal infection? Yeast ____, trich ____, gonorrhea ____, herpes ____, vulvar warts ____;

Any known problems found in previous pelvic exam?;

Any current symptoms vaginitis, etc.;

Are you sexually active at present?;

Physical examination results regarding vagina, cervix and associated parts.

Additional Student Health Services and University Hospital records contain documents relating to Ms. Mann's medical treatment which, if further described, would violate her right to privacy. This treatment occurred prior to the time of the events alleged in this case. None of the aforementioned records are discoverable, because they have virtually no relevance to the issues in this case and the privacy interest in them is great. There can be no question that the aforementioned information is of such a private nature that a constitutional right to privacy exists. In a civilized society in the year 1993, where vast amounts of personal information are contained not only in medical files but in computerized data banks or other massive government files, much of which is personal in character and potentially embarrassing or harmful if disclosed, *see Whalen [v. Roe],* 429 U.S. [589] at 605 [97 S.Ct. 869, 879, 51 L.Ed.2d 64 (1977)], the constitutional right to privacy is surely as significant as the protection of commercial information specifically recognized by Rule 45(c)(3)(B)(i). At least two privacy interests regarding medical records are implicated. The first, of course, is right to nondisclosure of private information. The "right to be let alone" is "the right most valued by civilized men." 429 U.S. at 599 n. 25 [97 S.Ct. at 877 n. 25] (quoting Justice Brandeis' dissent in *Olmstead v. United States,* 277 U.S. 438, 478 [48 S.Ct. 564, 572, 72 L.Ed. 944] (1928)). The second is the right to health care. If patients have a genuine concern that their private medical information will become publicly known and may adversely affect their reputations or embarrass them, they will be reluctant to seek medical assistance. Thus, patients' interest in making decisions vital to their health care may be impaired by unwarranted disclosures. *See Whalen,* 429 U.S. at 600.... [97 S.Ct. at 877]

Medical care providers, such as the University Hospital and the University Student Health Services, who create and maintain such information have a concomitant duty to avoid unwarranted disclosures. We believe that duty has its roots in the Constitution. *See Whalen,* 429 U.S. at 605 [97 S.Ct. at 879]. Thus, aside from its duty as a party to this litigation not to violate Ms. Mann's ... privacy right, the University has a separate duty as a custodian of private medical information to protect her records from unjustified intrusion.

\* \* \* \* \* \*

Not only should defendants' attorney and University counsel have been aware of the case law indicating that Ms. Mann's medical records were protected by constitutional privacy rights ... but it also appears from their actions that they were in fact aware of these protections. In the absence of the existence of a constitutional privacy right ... there was no reason for them to subpoena records that were already in their client's possession. Since, absent a ... privacy right, their client was free to discuss its own records with counsel, the only possible purpose for issuing the subpoena was in recognition that Ms. Mann had a right to assert a ... privacy right.

\* \* \* \* \* \*

Finally, in his opinion, at the conclusions of his analysis, the Magistrate Judge issued the following orders:

1. The University of Cincinnati and its inside and outside counsel are hereby PROHIBITED from utilizing or disclosing, for any purpose, any medical information regarding Ms. Mann obtained pursuant to a Rule 45 subpoena duces tecum prior to the production date set forth on the subpoena, including the Student Health Services Records and Dr. Kindel's records, with the exception of the one page undated report of Dr. Hani Abdulla. Any copies of such records presently in defendants' possession must be returned to the custodian. Nor may defendants utilize or disclose any other information, medical or non-medical,

which they may have obtained on the basis of leads provided by said medical records.

2. Upon the filing of an affidavit that defense counsel have not reviewed the University Hospital Records, the discoverable portion of said records will be provided to them.

All medical records provided through discovery are to be disclosed to defendants' counsel only. They may not be revealed to any other person, including the named defendants, without the Court's permission.

3. As required by Rule 45 and the general practices of this Court, defendants and their counsel must provide at least fourteen days notice to opposing counsel on all future subpoenas, absent exigent circumstances.

4. Defendants and their counsel are PROHIBITED from examining subpoenaed records prior to the return date of the subpoena.

5. The University of Cincinnati and its attorneys, being jointly liable for violating Ms. Mann's constitutional privacy right and her doctor-patient privilege by obtaining extremely private medical information which is irrelevant to this case are to compensate Ms. Mann in the amount of $2,500 and to pay the costs associated with preparing and arguing plaintiffs' motions for protective order, to quash subpoena, and for sanctions. Plaintiff's attorney is to file an affidavit within 60 days setting forth with specificity the hours spent on said activities and the reasonable hourly rate. Defendants then have 30 days to advise the Court whether they wish to challenge the reasonableness of the hours or the fees. If so, a hearing will be scheduled.

6. The Clerk of Courts is to serve a copy of this Order on the President of the University of Cincinnati so the University may review and reconsider its claimed practice of releasing medical information before the subpoena production date and without notice to the patient.

## ANALYSIS

■ We find, as did Magistrate Judge Steinberg, that the Defendants' conduct violated the Plaintiff's right to privacy, as well as Rule 45 of the Federal Rules of Civil Procedure. The medical records involved in · this case are of such a private and personal nature that the Plaintiff enjoys a right to privacy in them. *See Whalen v. Roe,* 429 U.S. 589, 598–99, 606–07, 97 S.Ct. 869, 876, 880, 51 L.Ed.2d 64 (1977); *In re Zuniga,* 714 F.2d 632, 641 (6th Cir.), *cert. denied,* 464 U.S. 983, 104 S.Ct. 426, 78 L.Ed.2d 361 (1983); *J.P. v. DeSanti,* 653 F.2d 1080, 1090 (6th Cir.1981); *G.M.C. v. Director of Nat. Institute, etc.,* 636 F.2d 163, 165–66 (6th Cir.1980), *cert. denied,* 454 U.S. 877, 102 S.Ct. 357, 70 L.Ed.2d 187 (1981); *Doe v. City of Cleveland,* 788 F.Supp. 979, 985 (N.D.Ohio 1991). To disclose the information contained in those records under the circumstances of this case unquestionably offends those "basic and fundamental rights" which we consider so "deeply rooted in our society" as to directly bear on our privacy rights. *See DeSanti,* 653 F.2d at 1090.

■ Thus, although the right to privacy is not absolute, the Plaintiff was entitled to an *in camera* review of such records *prior to disclosure to defense counsel* to determine if the necessity for disclosure outweighed the Plaintiff's right to privacy in those most personal of documents. *See In re Zuniga,* 714 F.2d at 641; *Doe,* 788 F.Supp. at 985. Consequently, we conclude that the Defendants' conduct in their effort to discover Ms. Mann's medical records violated her right to privacy in those records and warrants the imposition of sanctions.

■ With respect to sanctions under the Federal Rules of Civil Procedure, we observe that "the court has wide discretion in selecting the appropriate sanctions." *Jackson v. Law Firm of O'Hara,* 875 F.2d 1224, 1229 (6th Cir.1989).[2] Similarly, the courts "have the inherent power to impose a variety of sanctions on both litigants and attorneys...." *Stafford v. C.I.R.,* 805 F.2d 893, 894 (10th Cir.1986); *see Roadway Express,*

---

**2.** The Court notes that "Rule 26 sanctions are to be analyzed like those imposed under Rule

11...." *Ins. Ben. Administrators, Inc. v. Martin,* 871 F.2d 1354 (7th Cir.1989).

*Inc. v. Piper,* 447 U.S. 752, 764–67, 100 S.Ct. 2455, 2463–65, 65 L.Ed.2d 488 (1980). One prominent goal of imposing sanctions is deterrence. *Law Firm of O'Hara,* 875 F.2d at 1229. Thus, the United States Supreme Court stated in considering sanctions under Rule 37, "here, as in other areas of the law, the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such sanction, but to deter those who might be tempted to such conduct in the absence of such deterrence." *Nat. Hockey League v. Met. Hockey Club,* 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976) (per curium); *Frantz v. U.S. Powerlifting Federation,* 836 F.2d 1063, 1066 (7th Cir.1987) (the Court may "impose as a fine any sum that is appropriate for deterrent purposes").

 Furthermore, although deterrence is the principal goal of imposing sanctions, *Law Firm of O'Hara,* 875 F.2d at 1229, "compensatory and punitive purposes are also served ..." and therefore "courts may fashion sanctions to serve purposes not specifically discussed by the advisory committee...." Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, Federal Rules of Civil Procedure § 1336 (1990); *see* William W. Schwarzer, *Sanction under the New Federal Rule 11—A Closer Look,* 104 F.R.D. 181, 201 (1985) ("[t]he rule reflects a dual purpose: compensating the offended party for the expenses caused by the violation as well as penalizing the offender to achieve special and general deterrence. In assessing the gravity of the violation, therefore, the court should determine the extent to which the violation reflects a deliberate effort to misuse or abuse the litigation process"); *Brown v. Federation of State Medical Boards of U.S.,* 830 F.2d 1429, 1438 (7th Cir.1987). Consequently, the court may impose a fine "as light as a censure and as heavy as is justified—a fine that may exceed the amount of fees incurred by the opposing party." *Frantz,* 836 F.2d at 1066.

## CONCLUSION

The Court has reviewed the record in this case *de novo,* and concurs in, and hereby adopts, the Magistrate Judge's findings of fact and analysis with respect to the Plaintiff's right to privacy, and Rule 45. Based on the facts of this case, we conclude, without any hesitation, that this is exactly one of those "appropriate" cases warranting "the most severe in the spectrum of sanctions." Accordingly, we hereby affirm the Magistrate Judges' Order.

Consequently, in an effort to deter the Defendants and others for engaging in such harmful and improper conduct—conduct for which the Defendants have shown not the slightest remorse—as well as to compensate the Plaintiff, and as a punitive measure, we hereby ORDER the Defendants and their attorneys to pay Ms. Mann $2,500. Furthermore, with respect to the Plaintiff's Application for Award of Attorney's Fees and the Defendants' Objections, we conclude that the Plaintiff's additional request for $3,307.45 for the costs associated with preparing and arguing the Plaintiff's motions for protective order and to quash subpoena, is also reasonable in light of the outrageous and inexplicable conduct in which the Defendants have engaged in this case. Finally, the Court ADOPTS and AFFIRMS the Magistrate Judge's Order in all other respects as enumerated on pages nine and ten of this Order in accordance with this Court's wide discretion and inherent powers to impose appropriate sanctions.

Accordingly, consistent with the foregoing, we hereby AFFIRM the Magistrate Judge's Order and ORDER the Defendants to comply in all respects forthwith.

SO ORDERED.